628

560 A.2d 870

**PENNSYLVANIA DENTAL ASSOCIATION, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, INSURANCE DEPART-MENT; and Pennsylvania Dental Service Corporation, d/b/a Delta Dental of Pennsylvania, Respondents.**

Commonwealth Court of Pennsylvania.

Argued April 3, 1989.

Decided June 16, 1989.

John G. Milakovic, Thomas A. Beckley, Beckley & Madden, Harrisburg, for petitioner.

Craig J. Stuadenmaier, Spencer G. Nauman, Jr., David C. Eaton, Nauman, Smith, Shissley & Hall, Harrisburg, for respondent Pa. Dental Service Corp., d/b/a Delta Dental of Pa.

Heidi B. Hamman Shakely, Asst. Counsel, Theodie L. Peterson, Chief of Litigation, Linda J. Wells, Chief Counsel, Victoria A. Reider, Deputy Chief Counsel, Harrisburg, for respondent Ins. Dept.

Before CRAIG and BARRY, JJ., and KALISH, Senior Judge.

CRAIG, Judge.

The Pennsylvania Department of Insurance and Pennsylvania Dental Service Corporation (Delta Dental) raise preliminary objections to Pennsylvania Dental Association's (PDA) Complaint for Declaratory and Other Relief. Because we sustain the department's preliminary objections regarding this court's jurisdiction over this dispute, we need not address the department's other objections or Delta's preliminary objections.

The department objects to this court's jurisdiction, arguing alternatively that: (1) the department is not an indispensable party; (2) the department has exclusive jurisdiction; (3) PDA failed to exhaust administrative remedies; (4) the complaint fails to allege a ripe controversy between PDA and the department; and (5) PDA did not serve the Attorney General with the complaint. We will only address

the department's first argument, that it is not an indispensable party.

The pleadings indicate that Delta is a professional health service corporation as defined in Chapter 63 of the Insurance Code, The Professional Health Services Plan Corporations Act, 40 Pa. C.S. § 6302. Delta was formed in the 1960's with money PDA provided. PDA is the Pennsylvania arm of the American Dental Association. On March 1, 1973, the department informed Delta that Delta had reduced, or was reducing, Delta's surplus position because of operating losses. In response to the department's recommendation that Delta strengthen its surplus position, Delta asked PDA for additional funds.

PDA sent a letter to Delta on May 31, 1973 regarding contributions to surplus, which stated in part:

> At the meetings of the House of Delegates [of PDA] and in meetings of the Board of Trustees, mention was made of [Section 809] which has been used as a model by the Insurance Commissioner to permit advances to be shown as contributions to surplus rather than debts. From these discussions, it was learned that under certain conditions, interest could be paid on these advances; provided that both the repayment of principal and the payment of interest be made only out of surplus earnings of the Corporation and with the prior approval of the Insurance Commissioner....
>
> It is intended that if the conditions set forth in this letter are acceptable to [Delta] and are approved by the Insurance Commissioner that they will constitute a contract of [PDA] to advance the sum of $350,000. The said sum shall bear interest at the average rate paid each year on passbook savings accounts by banks in the City of Harrisburg, Pennsylvania, but not to exceed 10% a year. *Interest shall be payable (1) only in those years in which the operations of [Delta] result in an increase in earned surplus and the interest must be paid only out*

*of the earned surplus....; and (2) only at the time and in the amount approved by the Insurance Commissioner of Commonwealth of Pennsylvania.* [Delta] agrees to use its best efforts to secure approval for the payment of interest, when permitted by law, under the foregoing terms in this agreement. (Emphasis added.)

Delta asked the department to review PDA's proposal. In a letter dated June 18, 1973, Andrew Whitman, a Deputy Insurance Commissioner, stated that the department would use Section 809 of the Insurance Company Law, Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. § 919, as a "guideline" for the deposit and repayment of surplus contributions to Delta, and would approve the advances if made in accordance with Section 809 and the terms laid out in PDA's letter as follows:

Interest [can] be paid on the surplus contribution provided that both repayment of principal and interest be made only out of surplus earned in the year of repayment and with prior approval of the Insurance Commissioner.

. . . .

I might point out that the contribution is not a loan to the company since its repayment is subordinated to any other claims against the corporation, and interest may not be accumulated, and neither interest nor principle [sic] may be repaid except out of surplus which is earned in the year of repayment.

Delta and PDA entered into an agreement on August 10, 1973, identical to the May 31 letter PDA sent to Delta, under which PDA would provide Delta with capital funds. In accordance with that agreement, PDA advanced to Delta: $311,000 on September 7, 1973; $39,000 on October 2, 1973; $100,000 on February 1, 1975; and, $40,000 on January 27, 1976.

Delta, after accepting these advances, issued certificates for each advance reciting conformity with the principles of section 809, apparently relying on Whitman's statement of

the department's policy of using section 809 as a "guideline" for advances to professional health service corporations.

Between June 16, 1984, and May 20, 1987, Delta repaid all of the principal amount of the advances. By letter dated May 26, 1987, PDA asked Delta to join PDA in asking the department to approve payment of interest on the advances. Delta responded to PDA's request in a letter dated June 3, 1987, in which Delta's counsel indicated that Delta would pay interest on the advances "[i]f the Department required." The letter also stated:

Inasmuch as the question to be put to the Department is purely a matter of interpretation of law and regulations applicable to Delta, there is no need for PDA to be represented and advance its position. In fact, given the statute and regulatory nature of the matter, this would not be relevant to the question which Delta will put.

Accordingly, Delta herewith declines your request to join it in approaching the Department.

Delta's counsel wrote again to PDA on January 1, 1988 to inform PDA of the information obtained in meetings with the department. The letter stated in part:

[T]he Department takes the position that the provisions in the certificates that they are guaranteed and that they are subject to Section 809 must be given the same emphasis as the provision for interest. If Delta were mandated to pay interest at a particular time or at any time, the interest would be guaranteed and also have to be carried as a liability on the balance sheet of Delta in contradiction of Section 809....

Thus, the ordinary rules of a debtor/creditor relationship do not apply to 809 certificates. The Department's position as to mandated payment of interest is set forth in a letter to Gary Radine dated September 14, 1987....

The answer of the Department to the second question is that certificates calling for interest payments and exe-

cuted by Delta and PDA must in any event be governed by the position of the Department that interest does not accumulate. The rationale for the Department's position is derived from the provision of Section 809, stated above, allowing the amount of principal to appear as an asset without corresponding liability on the balance sheet of issuers of 809 certificates.

We note also that one letter from the department to Delta dated September 14, 1987, to which Delta refers in the letter quoted above, and another letter, dated November 9, 1987, discuss section 809 requirements, but in terms which can be read to be as consistent with contractual adoption of section 809 as a model, as with application of section 809 as governing the transaction by its own terms.

PDA, uncertain of its right to receive interest on the advances to Delta, and believing that the department is an indispensable party, initiated this action for declaratory relief.

This court has jurisdiction over the subject matter of a suit against the Commonwealth and others only when the Commonwealth is an indispensable party. *Royal Indemnity Company v. Department of Environmental Resources*, 39 Pa. Commonwealth Ct. 322, 395 A.2d 641 (1978). The department cites this court's decision in *Royal Indemnity*, and the Pennsylvania Supreme Court's decision in *Mechanicsburg Area School District v. Kline*, 494 Pa. 476, 431 A.2d 953 (1981), to support the argument that the department is not an indispensable party.

In *Royal Indemnity* we held that the Department of Environmental Resources was not an indispensable party to a declaratory judgment action filed by a party against whom an order to remove a sewer was sought to be enforced, when the only interest the department had in the matter was ensuring that the party did not violate the Clean Streams Law during removal of the sewer, and when the

trial court's removal order could not be interpreted as compelling any violation of the Clean Stream Law. 39 Pa. Commonwealth Ct. at 325–26, 395 A.2d at 642.

*Mechanicsburg* involved an equity action in which the Mechanicsburg School district sought, among other things, to enjoin the Secretary of Revenue, the Secretary of Education, the Auditor General, and the State Treasurer from repaying the final installment of school subsidies for the 1977–78 school year. The school district argued that all other school districts were indispensable parties. The Supreme Court concluded that the "distinct cause of action asserted by appellant is founded on its lawful statutory right to receipt of a correctly computed subsidy payment. We see no reason why the cause cannot be litigated and decided without impairing the lawful rights of the other school districts." 494 Pa. at 486, 431 A.2d at 959.

PDA, on the other hand, attempts to distinguish those cases, and regards *Action Coalition of Elders v. Allegheny*, 493 Pa. 302, 426 A.2d 560 (1981), as stating the appropriate standard for determining when a party is indispensable. Although Justice Flaherty, writing an opinion in support of the judgment, advocated an alternative analysis to the traditional indispensable party standard, the other Justices declined to join Justice Flaherty's suggested approach, and merely agreed that, under the circumstances, the Department of Public Welfare was an indispensable party, thus making this court the proper forum for Action Coalition's request for declaratory judgment.

Justice Flaherty's opinion analyzed the cause of the dispute—uncertainty regarding the effect of Pennsylvania's participation in the Federal Medicaid Program on the duties imposed on local governments under the Pennsylvania County Institution District Law—and concluded that because the issue "obviously and substantially affects [the Pennsylvania Department of Public Welfare]" the Commonwealth was an indispensable party. 493 Pa. at 307, 426

A.2d at 562. At least a majority of the concurring justices did not dispute that result.

More recently, this court has stated that "a party is indispensable only where its rights are so connected with the claims of the litigants that no order or decree can be effected without impairing such rights." *Nason v. Commonwealth of Pennsylvania,* 90 Pa. Commonwealth Ct. 130, 134, 494 A.2d 499 (1985). Although the parties did not question this court's jurisdiction in *Nason,* the court concluded that because no order of this court would or could impair the rights of the General Assembly or the Governor with regard to appropriations of funds, those parties were not indispensable to the suit. 90 Pa. Commonwealth Ct. at 134, 494 A.2d at 501. With these cases in mind we will consider the department's role in this dispute.

■  At the heart of this controversy is PDA's and Delta's reliance on the department's reference to section 809 of the Insurance Company Law, 40 P.S. § 919. Section 809 states:

**Loans to companies**

Any director, officer or member *of any mutual insurance company,* other than a mutual life company, *or any other person, may advance to such company* any sum or sums of money necessary for the purpose of its business or to enable it to comply with any of the requirements of the law. Such moneys, and such interest thereon as may have been agreed upon, not exceeding ten per centum (10%) per annum, shall not be a liability or claim against the company or any of its assets, and shall be repaid only out of the surplus earnings of such company. No commission or promotion expenses shall be paid in connection with the advance of any such money to the company, and the amount of such advance shall be reported in each annual statement.

Such company shall prior to making such advances provide the Insurance commissioner with such evidence

as he may by regulation prescribe concerning the making of any such advance or the making of any payments, whether of principal or interest, on account thereof. (Emphasis added.)

Although the department has the power to interpret Section 809 and to promulgate regulations under that statute, the department may exercise its interpretive and regulatory powers only if section 809 governs the subject matter of the controversy. We believe the subject of this dispute concerns only the final agreement between PDA and Delta, and that such an agreement is not subject to regulation under section 809 by virtue of the statute itself.

Instead, the statutory provisions relating specifically to professional health service corporations provide a relevant starting point.

Section 6307 of the Insurance Code, 40 Pa. C.S. § 6307, concerns the relationship between professional health service corporations and the insurance laws:

§ **6307. Exemptions applicable to certified professional health service corporations**

(a) **General insurance laws.**—A professional health service corporation shall be subject to regulation and supervision by the Department of Health and the Insurance Department under this chapter. A professional health service corporation holding a certificate of authority under this chapter *shall not be subject to the laws of this Commonwealth now in force relating to the business of insurance,* and no statute hereafter enacted relating to the business of insurance shall apply to such a corporation *unless such statute shall specifically refer and apply to a corporation subject to this chapter.* (Emphasis added.)

Section 6307 gives the department the right to regulate and supervise professional health service corporations; however, this section specifically states that the insurance

laws do not apply to professional health service corporations unless a particular law specifically states that it applies to those corporations.

Although section 809 provides the department with regulatory power over loans and advances, section 809 is applicable by its terms only to mutual insurance companies. The department, in its brief, states that Delta is not a mutual insurance company. Neither PDA nor Delta has claimed (nor do we think they could) that Delta is a mutual insurance company. Section 809 and the regulations the department promulgated under that section simply do not apply to professional health service corporations.

We have reviewed Chapter 63 and the regulations the department has adopted under that chapter and the general insurance laws. Assuming that the regulations the department has promulgated implementing the department's statutory right to monitor the financial condition of professional health service corporations, located at 31 Pa.Code §§ 147.1–147.14, implicitly give the department the power: (1) to determine the amount of surplus a professional health service corporation must maintain; and, (2) to approve or disapprove this agreement, those regulations do not mandate the use of section 809 as a guideline for the advance. The purpose of those regulations is limited to:

> [The improvement of] the Department's surveillance of the financial condition of insurers by requiring an annual examination by independent accountants of the financial statements reporting the financial condition and the results of operations of such insurers.

31 Pa.Code § 147.1.

The applicable statutes and regulations do not require specifically that a professional health service corporation comply with Section 809 when a seeking to increase its surplus funds. Once the department approved the contract, the contract became effective, but binding only on PDA and Delta. Although the contract includes a clause requiring

department approval before Delta makes repayments, the interpretation of the terms of repayment, relating to principle and interest, under the contract does not involve the department, because, as discussed above, section 809 does not apply by reason of its own terms. As suggested above, section 809 does not give the department the statutory or regulatory authority over the terms of the contract.

This court does not have jurisdiction to determine the rights established in a contract merely because the department exercises its purported power to approve contracts involving professional health service corporations, or because the department condoned PDA's and Delta's reference to section 809 in their agreement.

Even if it be later determined that the parties' agreement referred to section 809 as a guideline, to govern their transaction by their mutual adoption of it, that would not result in the department being officially involved as a party.

Thus, we agree with the department that, because the ultimate issue in this case involves a contractual dispute between two private parties, and does not affect or impair the rights of the department, we must conclude that the Court of Common Pleas of Dauphin County, the county where PDA and Delta are located, rather than this court, has jurisdiction over this matter. We transfer this case as provided in Chapter 51 of the Judicial Code, 42 Pa. C.S. § 5103.

## ORDER

NOW, June 16, 1989, the preliminary objection of the Pennsylvania Department of Insurance challenging this court's jurisdiction over the subject of this dispute is sustained, the action against the Department is dismissed, and the action against Pennsylvania Dental Service Corporation is transferred to the Court of Common Pleas of Dauphin County.